(C. D. 1336)

STEWART ROMERO BOOT SHOP *v.* UNITED STATES

United States Customs Court, First Division

(Decided June 15, 1951)

*Lawrence, Tuttle & Harper (George R. Tuttle* and *Charles J. Evans* of counsel) for the plaintiff.

*David N. Edelstein,* Assistant Attorney General (*Richard H. Welsh* and *Richard F. Weeks,* special attorneys), for the defendant.

Before OLIVER, COLE, and MOLLISON, Judges; COLE, J., concurring

MOLLISON, Judge: The merchandise the subject of this protest consists of 1,136 pairs of leather boots, cowboy style, imported from Mexico. They were assessed with duty at the rate of 20 per centum ad valorem under the provision in paragraph 1530 (e) of the Tariff Act of 1930, as unmodified, for—

Boots, shoes, or other footwear (including athletic or sporting boots and shoes), made wholly or in chief value of leather, not specially provided for, * * *.

As filed, the protest claims that duty should have been assessed on the boots in question at 10 per centum ad valorem upon three alternate grounds:

(1) Under paragraph 1530 (e), as modified by the British Trade Agreement, T. D. 49753, providing for—

Boots, shoes, or other footwear (including athletic or sporting boots and shoes), made wholly or in chief value of leather by the process or method known as welt, and not specially provided for.

(2) Under the same paragraph, as modified by the Swiss Trade Agreement, T. D. 48093, providing for—

Turn or turned boots and shoes, made wholly or in chief value of leather, not specially provided for.

(3) Under said paragraph, as modified by the Mexican Trade Agreement, T. D. 50797, providing for—

Men's, youths', and boys' boots, shoes, or other footwear (including athletic or sporting boots and shoes), made wholly or in chief value of leather, not specially provided for (except turn or turned, or sewed or stitched by the process or method known as McKay, or made by the process or method known as welt).

Although not specifically abandoned, no evidence was presented bearing upon ground No. 2, and it was not mentioned in the brief filed on behalf of the plaintiff. It will therefore not be considered here.

In view of the fact that paragraph 1530 (e), as modified by the Mexican Trade Agreement, excepts from classification thereunder boots made by the process or method known as welt, consideration will first be given to the claim under paragraph 1530 (e), as modified by the British Trade Agreement, providing for boots "made wholly or in chief value of leather by the process or method known as welt."

There is no dispute that the boots in question were made wholly or in chief value of leather, and there is apparently no real dispute as to the actual method by which they were made—the dispute centering about whether that method was "known as welt" or otherwise.

We have before us as exhibit 1 a boot identified as representative of the merchandise involved, which exhibit has been cut away in such manner as to show the method of construction used. A careful examination of exhibit 1 and a consideration of the testimony of plaintiff's witness Stewart outlining the method of manufacture show some variance between the construction of exhibit 1 and the witness' description of how it was manufactured. The variance does not appear to be material, but will be pointed out hereinafter. It should be stated that the witness Stewart was a partner in the plaintiff firm who was shown to have had considerable experience in the manufacture and other phases of the boot and shoe industry. His description of the method of manufacture of exhibit 1 was as follows:

(1) The top, or upper, is first made and then placed over a wooden last. (2) An insole is then put on the last, and the upper is "pulled over." The witness omitted to describe how the upper was fastened to the insole, but from an examination of exhibit 1, it appears that the lining of the upper was turned in and fastened by cement to the insole, while the upper, exclusive of the lining, was turned out. (3) A middle sole is then cemented to the insole. (4) The witness

testified that then a strip of welting, which is a narrow strip of leather, is placed on top of the edge of the upper, and the welting, upper, and middle sole are sewed together by means of what he called a "welt machine." (5) Following this, the witness said, the outsole is sewed to the middle sole on the outer edge.

The variance between the witness' testimony and the construction that appears in exhibit 1 is in steps (4) and (5). Instead of step (4) being a sewing of the welt, upper, and middle sole together, it appears from exhibit 1 that only the upper and middle sole are sewn together at this point, and that step (5) consists of sewing the welt, upper, middle sole, and outer sole together. The variance does not appear to be material, but it is reported in the interests of accuracy. As an aid in understanding the situation, a cross-section outline of exhibit 1 appears as follows:

The witness testified that the process he described—

\* \* \* is not known as the Goodyear welt process, because we are not using a United States patent royalty-applied Goodyear welt machine, controlled and owned by the United Shoe Machinery Company of America.

He did state, however, that it was "a welt process" and that "practically any process with which you use a welting belongs to what we call a welt family, as would be spoken of in the manufacturing or shoe terms."

It is clear from the testimony given by the witness, and from the brief filed on behalf of the plaintiff, that under plaintiff's theory any boot on which a welt or welting is used is considered to have been made by the process known as welt. Thus, at page 11 of plaintiff's brief, we find:

Therefore, whether the narrow strip of leather on boots like exhibit 1 is termed a "stitchdown strip" or a "little piece of work," it is a welt, *and a boot containing this narrow strip of leather is made by the process known as welt.* [Italics added.]

On cross-examination, the witness stated that he was familiar with the stitchdown method of shoe manufacture which, he said, was a very simple method in which the upper is sewed to the outsole of the shoe. He stated that the stitchdown method does not have a separate insole and a separate outsole but that "the welt, the regular Goodyear welt, or a welt family" has a separate insole and a separate outsole.

Exhibit 1, he said, was made by a process which would be called in the United States "pre-welt," and while the Goodyear welt process was commonly known in the United States as the welt process, or as one of the welt processes, there were various other types of welt process, such as the pre-welt and Mix-To.

It is the defendant's position that the "process or method known as welt" is a particular method of shoe manufacture, the definitive characteristics of which are not exhibited in the boots in question as represented by exhibit 1.

Defendant offered the testimony of two witnesses, one of whom had been engaged in building and repairing machines for the shoe manufacturing trade for 30 years, and the other had been in the shoe industry, principally as a salesman, for 48 years. Both of these witnesses testified that they were familiar with the stitchdown and with the Goodyear welt processes of manufacturing boots and shoes, and each testified that they knew of no other welt process in the United States than the Goodyear welt process.

Both witnesses identified the method of manufacture used in the case of exhibit 1 as the stitchdown method, which differed from the welt method. Both indicated that the distinguishing characteristic of the welt method or process is the channeling of the insole, raising a lip on the underside thereof, to which the upper and welt are sewed in one operation, the outsole then being sewed to the welt.

One of the witnesses testified that he was familiar with the pre-welt process, which he described, and stated that exhibit 1 was not made by the pre-welt method.

We are of the opinion that the preponderance in weight of the evidence favors the contention of the defendant that the welt process is a distinctive process of shoe manufacture, different from the stitchdown process, and that the boots in question were not made "by the process or method known as welt" but were made by the stitchdown process or method. If corroboration were needed, it is to be found in the definitions in Webster's New International Dictionary, 2d ed., 1945, of the terms "stitchdown" and "welt" as follows:

stitchdown, *n. Shoe Mfg.* The stitching of the outturned lower edge of a shoe upper directly to the sole, or sometimes with a welt added over the edge; also, a shoe so made.

**welt,** *n.* \* \* \* **7.** *Shoe Mfg.* A narrow strip of leather used in making a welt shoe, in which the welt, shoe upper, and lining, are sewed to a lip on the surface of the insole. The outsole is afterward sewed to the welt, leaving the shoe perfectly smooth inside. Welts are used in making certain stitchdown shoes to reinforce the stitches uniting the outsole to the middle sole and upper.

See also Encyclopaedia Britannica, 14th ed., vol. 3, p. 888, showing cross-sectional views of shoes made by the stitchdown method and by the Goodyear welt method. It will be observed that the illustration of the stitchdown method depicts in all material respects the construction used in exhibit 1, and that the welt method is materially different therefrom.

We therefore proceed to a consideration of plaintiff's alternate contention, i. e., that the boots in question were boys' or youths' boots within those terms as used in the modification of paragraph 1530 (e) contained in the Mexican Trade Agreement, *supra.* It appears that all shoes below invoice size 19 were classified by the collector as not within the foregoing provision for the reason that they were considered to be "children's" boots, and not boys' or youths' boots. The boots covered by the invoice which are here involved run from size 15 to size 18, these being Mexican sizes, corresponding to American sizes 8 to 11.

It is to be noted that the provision in the Mexican Trade Agreement is for "Men's, youths', and boys' boots," etc., and it is undisputed that the boots involved are not men's boots, so that the question is whether they are youths' or boys' boots. Both plaintiff and defendant elicited testimony and have based their arguments, for the most part, upon the theory that the sizes of boots such as those in question are indicia of the classes, i. e., men's, youths', boys', etc., within which they fall.

We think it not amiss at this point to state the generally known fact, which also appears from the record herein, that American shoe sizes have two series of numbers, running up to 13½ in the children's series, and beginning again with size 1 in the adult series.

Both witness Stewart for the plaintiff and witness Mehle for the defendant, who were the only witnesses interrogated on the subject, agreed that the "boys' " classification generally runs from size 2½ up in the adult series. As all of the boots here in question are under that size, it is apparent that they do not fall within the classification of "boys' " boots. Some testimony was elicited indicating that the boots here in question were designed for and mainly used by small boys, but we do not understand plaintiff's claim to be that any boot or shoe designed for or worn by boys, regardless of age or size, is to be included within the term "boys' " boots or shoes, as used in the trade agreement. If this actually be contended, however, it is refuted by the evidence that boys' boots or shoes are generally understood to be those running in size from 2½ up.

This leaves for consideration only the question as to whether the boots in question were "youths'" boots. Apparently neither the witness Stewart nor the witness Mehle regarded the classification of "youths'" boots as fixed and definite. Thus, Stewart first apparently did not know what the term "youth" meant (Tr. p. 34); then said that there was a "trade name as youth" and that the size thereof "depends on the manufacturer who is making them"; that children's and youths' classes dovetailed into or lapped over each other, but could not say definitely the overlap (Tr. p. 35); and then guessed that the youths' sizes would be from 10 to 13 (Tr. p. 36), and later said that anything under size 2½ would be youths', and finally that children's and youths' would be practically the same (Tr. p. 38). He then stated that all of the shoes involved of the Mexican sizes 15 to 18 are, in his opinion, children's shoes or children's sizes.

Witness Mehle first termed youths' sizes from 11 to 2, being shoes made exclusively for little boys. He referred to a factory in Omaha which terms their boots as youths' boots from 10's to 2's, and referred to the fact that in the Boy Scout line "they have a few sizes what they call their youths' sizes in there, which are 12, 12½'s, 13's, 13½'s, they call those youths'." His jobbing house, he said, calls 10's to 2's youths' boots.

As is seen, the evidence offered by each witness' testimony is not consistent with itself nor are the two witnesses in complete agreement, but in view of the fact that there is no contention in this case that the commercial meaning of the term "youths'" differs from the common meaning, the court is not bound by the testimony of the witnesses on the point. The common meaning of tariff terms is a question of law for the court to determine, and the testimony of witnesses, insofar as it bears upon such meaning, is advisory only. *Marvel* v. *Merritt*, 116 U. S. 11, 29 Law. ed. 550; *United States* v. *May Department Stores Co.*, 16 Ct. Cust. Appls. 353, T. D. 43090.

The tariff classification of "Men's, youths', and boys' boots," etc., was a new one in the Mexican Trade Agreement, but reference to the Digests of Trade Data issued by the Tariff Commission in 1943 with respect to that trade agreement fails to shed any light on the meaning intended to be placed upon the word "youths'."

It is noted that the witnesses were in apparent agreement that the term "youths'" refers to a size classification below that of "boys'." Yet, it will be observed that the sequence expressed in the trade agreement provision is "Men's, youths', and boys'" boots, etc., indicating that the "youths'" classification would fall between the men's and the boys' classifications.

This, also, seems to be the view of lexicographers, as an examination of the following dictionary definitions reveals:

Webster's New International Dictionary, 2d ed. 1945:

**youth,** *n.* \* \* \* **2.** The part of life that succeeds childhood; the period preceding maturity, usually that from puberty to maturity; adolescence; sometimes, the whole early part of life, from childhood or infancy to maturity. \* \* \* **6.** A young person of either sex; esp., a young man.

Funk & Wagnalls New Standard Dictionary, 1942:

**youth,** *n.* \* \* \* **2.** The period when one is young; that part of life between childhood and manhood. **3.** A young man; more rarely, a young woman.

See also in this connection the cases of *United States* v. *Abercrombie & Fitch Co.*, 20 C. C. P. A. 267, T. D. 46060, and *United States* v. *The Halle Bros. Co.*, 20 id., 281, T. D. 46077, wherein "youth" was similarly regarded.

Our understanding of the term accords with the foregoing, and we do not find the testimony offered by the parties with respect to the meaning of the term "youths'" to be of sufficient assistance to cause us to determine that the term as used in the tariff classification "Men's, youths', and boys' boots," etc., includes boots of the sizes of those here involved.

Judgment will therefore issue overruling all of the protest claims accordingly.

CONCURRING OPINION

COLE, Judge: This case was heard and submitted before a single member of this court on circuit under statutory authorization issued by the chief judge to hear or to hear and determine the case (28 U. S. C., 1946 ed., Supp. III, §254).

My views set forth in *Geo. S. Bush & Co., Inc., et al.* v. *United States*, 22 Cust. Ct. 158, C. D. 1175, questioning the jurisdiction of the division to decide a case similar to these proceedings, continue as the minority expression from the division. Under the practice and procedure of the court and the rules applicable thereto, much litigation before the court is dependent upon my participation in a decision of the same. Adhering, however, to my views expressed in the *Bush* case, *supra*, but for the purpose of expediting the work of the court, I am joining my colleagues in the disposition of this case, and concur in the opinion and judgment attached thereto.